**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PROACTIFI, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 25-cv-6155** |
| | ) | |
| **v.** | ) | **Judge Jeffrey I. Cummings** |
| | ) | |
| **RAGHAV MAINI,** | ) | |
| | ) | |
| **Defendant.** | ) | |

# MEMORANDUM OPINION AND ORDER

Plaintiff Proactifi, Inc. ("Proactifi") brings this suit against its former employee, Raghav Maini, alleging that Maini violated the Computer Fraud Abuse Act ("CFAA"), 18 U.S.C. §1030, *et seq*., and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §1831 *et seq.*, by unlawfully using and disclosing Proactifi's trade secrets and highly confidential proprietary data after his separation from Proactifi on April 28, 2025. In addition to its federal statutory clams, Proactifi brings state law claims against Maini for breach of contract, breach of implied covenant of good faith and fair dealing, specific performance, violation of the Illinois Trade Secrets Act, 765 ILCS §1065/1 et seq., conversion, and tortious interference with business relationship.

Maini has moved to dismiss Proactifi's complaint under Federal Rules of Civil Procedure 12(b)(1), (5), and (6) for lack of subject matter jurisdiction, insufficient service of process, and failure to state a claim, respectively. Maini alternatively argues that this case should be stayed or dismissed under the *Colorado River* abstention doctrine based on a purportedly parallel proceeding in the Circuit Court of Cook County, Illinois. For the reasons that follow, Maini's motion to dismiss, or, in the alternative, to stay this matter, (Dckt. #12), is denied.

# I. THE FACTS ALLEGED IN PROACTIFI'S COMPLAINT

The following facts are taken from Proactifi's complaint, (Dckt. #1), and the exhibits attached thereto.[1]

## A. Initial Business Relationship Between Proactifi and Maini

Plaintiff Proactifi, Inc. describes itself as "an AI-powered product and services company that helps enterprise operational leaders gain full visibility into their software ecosystems." (*Id.* ¶3). Proactifi's founder and Chief Executive Officer, Andrew Pekin ("Pekin"), serves as Proactifi's sole director on its Board of Directors. (*Id.* ¶¶15–16). Pekin met defendant Raghav Maini in November 2023. (*Id.* ¶18). In December 2023 and January 2024, Proactifi engaged Maini as a consultant, specifically as a software engineer, to develop RealTalk, one of Proactifi's software applications. (*Id.* ¶19). At the start of their business relationship, Maini and Proactifi entered into two agreements: a December 2023 confidentiality agreement (the "Confidentiality Agreement") and a 2024 consulting agreement (the "Consulting Agreement"). (*Id.* ¶¶20–21).

## B. Terms of the Consulting Agreement and Confidentiality Agreement

Through the Consulting Agreement and the Confidentiality Agreement, Maini acknowledged that Proactifi's "Confidential Information was/is developed at great expense, is kept and protected as confidential information, and that the disclosing party and/or the disclosing party's affiliates would suffer great loss and irreparable damage if any Confidential Information is improperly used or disclosed to other parties." (Dckt. ##1-1 at 2; 1-2 at 5). Maini therefore agreed under both agreements to "safeguard the Confidential Information from unauthorized use,

[1] "[I]n addition to the allegations set forth in the complaint itself," the Court may consider, "documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice" when resolving a motion under Rule 12(b)(6). *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

access, or disclosure using at least the degree of care it uses to protect its most sensitive information and no less than a reasonable degree of care." (*Id.*).

### C. Maini's Employment Outside Proactifi

In early to mid-2024, Maini became a full-time computer engineer at Amazon Web Services ("AWS") on its CloudFormation team. (Dckt. #1. ¶23). Maini worked as an intern for AWS for two summers prior to being hired as a full-time employee. (*Id.* ¶¶23–24). Maini continued to work as a consultant for Proactifi throughout most of 2024, (*id.* ¶26), and ultimately terminated his employment with AWS in or around October 2024 to join Proactifi on a full-time basis, (*id.* ¶¶28–30).

### D. Maini Joins Proactifi Full-Time

Maini joined Proactifi as a full-time employee in November 2024, specifically as Chief Technology Officer and a computer engineer. (*Id.* ¶30). In connection with his full-time employment at Proactifi, Maini entered a Joinder to Amended and Restated Stockholders Agreement on or around November 13, 2024 ("Joinder Agreement") and a Restricted Stock Grant Agreement with Proactifi on or around November 26, 2024 ("Grant Agreement"). (*Id.* ¶34).

### E. The Grant Agreement, Joinder Agreement, and Stockholders Agreement

Under the Grant Agreement and Joinder Agreement, Maini acquired 2,971 shares of Proactifi's Class A Voting Common Stock, (Dckt. #1-4 at 2), and agreed to be "fully bound by, and subject to," Proactifi's "Stockholders Agreement," (Dckt. #1-3 at 2).

Like the Consulting and Confidentiality Agreements, the Stockholder's Agreement provided that Proactifi's Confidential Information had been "established at great expense" and Maini agreed not to use or disclose, or cause to be used or disclosed (for purposes other than

conducting Proactifi business), any Confidential Information that he acquired during his relationship with Proactifi, regardless of "whether owned by the Company prior to or discovered and developed subsequent to [Maini's Restricted Stock] ownership and regardless of the fact that he . . . may have participated in the discovery and development of that information." (Dckt. #1-5 at 12).

### F. Deterioration of the Parties Relationship

Proactifi alleges that during Maini's tenure as Chief Technology Officer, he "increasingly desired more control and power over the company," despite the fact that he was not a board member. (*Id.* ¶63). For example, in February 2025, Maini began to present Pekin with concerns regarding corporate governance. (*Id.* ¶65). Pekin was generally "uncomfortable" with the complex corporate governance for which Maini advocated, (*id.* 69), but expressed that he was open to a 2-to-1 board seat arrangement, (*id.* ¶70). Maini nevertheless insisted "that the board seats had to be 1:1 or better." (*Id.* ¶71). Pekin refused and the relationship between Pekin and Maini quickly began to deteriorate. (*Id.* ¶72).

In March 2025, Pekin had become suspicious of Maini's activities and poor performance as Chief Technology Officer, particularly because in the weeks after their relationship started to deteriorate, Maini withheld visibility from Pekin into the code of a specific project. (*Id.* ¶73). This prompted Pekin to look for ways to protect Proactifi's trade secrets and other proprietary files by monitoring and restricting Maini's access to Proactifi's confidential data and end-point systems. (*Id.* ¶74).

### G. Maini's Alleged Wrongful Conduct, Access, and Communications

On April 28, 2025, Maini resigned "from employment with Proactifi." (*Id.* ¶70). In an email to Pekin dated May 1, 2025, Maini wrote that he was "voluntarily resign[ing] from [his] role as CTO." (*Id*. ¶80).

In sum, Proactifi alleges that while Maini was working for the company, and after his separation, "he undertook malicious computer activities on Proactifi's systems." (*Id.* ¶103). For example, Maini made "multiple repeated access attempts to key select Proactifi tools," (*id.* ¶61). mass downloaded PDF/Office export and raw files to his local devices without the permission of Proactifi, (*id.* ¶82), tried to sync and copy copies of Proactifi's systems, (*id.* ¶83), and manipulated the audit trail (audit logs) both before and after his separation in an attempt to cover his activity, (*id.*). In general, Maini "used ProxyBypassList to circumvent secure routes and monitoring systems, effectively evading corporate firewalls, VPN restrictions, and security policies," (Dckt. #1 ¶132). On one occasion, Maini "unlawfully exfiltrated or accessed without authorization . . . the file titled 'V1Functional – NonFunctional Polish,' which "contain[ed] all the requirements for RealTalk . . ., including highly sensitive and important data, competitive information, customer data, computer code, and other intellectual property owned by Proactifi (including its federally protected trademark and logo)." (*Id.* ¶105). Maini further "blocked" Pekins access to Heroku, a business tool used by Proactifi, and "removed all preexisting documents and files owned by Proactifi." (*Id.* ¶111). According to the complaint, Maini similarly blocked and interfered with a number of Proactifi's other key providers, including Proactifi's Google Cloud service and GitHub, which is a code repository for Proactifi's proprietary code. (*Id.* ¶112).

After he separated from Proactifi, Maini sent multiple emails to a "key referral source of Proactifi" claiming that Pekin had completed "a large unapproved transfer of company funds," and caused "a breakdown in governance," among other remarks about the company and Pekin. (*Id.* ¶113). On the same day, Maini "accessed and publicly disclosed Proactifi's private repositories on GitHub that contained Proactifi's confidential deployment scripts and backend code, including proprietary information relating to BA," (*id.* ¶115), an AI tool that Proactifi has developed and intends to "rollout," (*id.* ¶3). Maini further "publicly revealed in GitHub the chosen trademark by which Proactifi intends to identify its new product, which only a few key prospective customers knew about, and falsely associated himself in his individual capacity as the author of the new product." (*Id.* ¶116).

### H. Board Determination

On May 4, 2025, Proactifi's Board, in consultation with nearly all of its stockholders and investors, determined that Maini's conduct and activities constituted a breach of his restrictive covenants, automatically cancelling and forfeiting his restricted stock (the "Board Determination"). (*Id.* ¶120).

### I. Conduct Post-Board Determination

On the same day as the Board Determination, Proactifi, through its counsel, demanded that Maini make the GitHub repository private. (*Id.* ¶125). Instead, Maini deleted the repository, which contained Proactifi's proprietary code. (*Id.*). A few days later, Maini "had set up and maintained unauthorized access to Proactifi's computer systems through three virtual machines." (*Id.* ¶129). Around the same time, he continued to impede Proactifi's access to various applications, which caused the cancellation of an important meeting, which could have led to a $100,000 opportunity, because Pekin had to divert his attention to combat Maini's ongoing

tampering. (*Id.* ¶¶142–44, 212). Proactifi also engaged forensic consultants to assess the extent of its data exfiltration. (*Id*. ¶151).

### J. State and Federal Lawsuits, and Service on Maini in Michigan

The parties engaged in pre-litigation settlement negotiations. (Dckt. #13-2). In those negotiations, Maini represented that he resided at an address in New York. (*Id.* at 3). The negotiations were ultimately unsuccessful and on May 23, 2025, Maini filed a lawsuit against Pekin and Proactifi in the Circuit Court of Cook County, Case No. 2025 L 006715, the ("State Court Action"). (Dckt. #13-1). Maini's lawsuit was centered on what he alleged was the "unjust[] depriv[ation] . . . of his rightful ownership stake and involvement in [Proactifi]." (*Id.* at 1). Maini filed an amended complaint in the State Court Action on August 29, 2025.[2] *See* Dckt. in Case No. 2025 L 006715.

Proactifi initiated this action against Maini in this Court approximately a week later on June 2, 2025. (Dckt. #1). Proactifi, through its process server, served a copy of the summons in this case at an address in Troy, Michigan, and left the materials with Maini's mother, Sonia Maini. (*Id.* ¶16-5). While being served, Sonia Maini stated that Maini lived at the Troy, Michigan address. (*Id.* at 1).

## II. ANALYSIS

Maini now moves to dismiss Proactifi's complaint under Federal Rules of Civil Procedure 12(b)(1), (5), and (6) for lack of subject matter jurisdiction, insufficient service of process, and failure to state a claim, respectively. The Court addresses each argument in turn.

---

[2] "It [is] well established that judges may take judicial notice of matters of public record when ruling on a motion to dismiss." *Fosnight v. Jones*, 41 F.4th 916, 922 (7th Cir. 2022).

**A. Proactifi Has Demonstrated That This Court Has Jurisdiction Over Maini Through Effective Service**

Maini first argues that Proactifi's claims against him should be dismissed pursuant to Rule 12(b)(5) for failure to properly effectuate service of process under Rule 4(e). Proactifi, as the plaintiff, "bears the burden to demonstrate that the district court has jurisdiction over [Maini] through effective service." *Cardenas v. City of Chicago*, 646 F.3d 1001, 1005 (7th Cir. 2011). When conducting an analysis under Rule 12(b)(5), the Court may consider matters outside the pleadings. *See United States v. Park*, 389 F.Supp.3d 561, 567 (N.D.Ill. 2019); *Kurtzeborn v. Ritzhaupt*, No. 3:22-CV-00746-DWD, 2023 WL 319406, at *1 (S.D.Ill. Jan. 19, 2023). Upon review of the record, it is clear that Maini was properly served.

Rule 4(e) provides that service may be accomplished by, among other things, leaving a copy of the summons and complaint with the defendant personally or at the defendant's dwelling or usual place of abode with someone of suitable age and discretion. Fed.R.Civ.P. 4(e)(2).[3]

Maini acknowledges that the summons and complaint were served on his mother at an address in Troy, Michigan, but argues such service did not comply with Rule 4(e) because: (1) he communicated to Proactifi's counsel in a pre-litigation letter that he resides at an address in New York; and (2) the summons and complaint were not left with him personally. (Dckt. #13 at 2–3). Neither argument passes muster.

First, Maini's argument that Rule 4(e) requires Proactifi to effectuate service at Maini's New York address because he provided that address to Proactifi's counsel before he was served is incorrect. As several courts have explained, individuals may have more than one "usual place of

[3] Maini relies on Illinois state law to argue that service was not proper under Rule 4(e). Maini is correct that service *can* be effectuated by following the relevant state law for effective service, *see* Rule 4(e)(1); this, however, is not the *only* method for effectuating proper service under Rule 4(e). *See* Rule 4(e)(2). Maini's sole reliance on state law as a basis for this argument is misplaced.

abode" for purposes of service. *See, e.g.*, *U.S. v. Mellon*, 719 Fed.Appx 74, 76 (2d Cir. 2018) (citing *Nat'l Dev. Co. v. Triad Holding Corp.*, 930 F.2d 253, 257 (2d Cir. 1991) ("In a highly mobile and affluent society, it is unrealistic to interpret Fed. R. Civ. P. 4 so that the person to be served has only one dwelling house or usual place of abode at which process may be left.")) (cleaned up); *Hensiek v. Bd. of Directors of Casino Queen Holding Co., Inc.*, No. 3:20-CV-377-DWD, 2024 WL 837202, at *2 (S.D.Ill. Feb. 28, 2024) (collecting cases).

In this case, the record shows that Maini has two usual places of abode: New York and Michigan. As explained in Pekin's declaration, Maini's Michigan address was listed on his driver's license and he filled out a federal government form representing his "Residential Street Address" was in Troy, Michigan. (Dckt. #16 at 3; Dckt. #16-3). Moreover, Maini's mother lives at the Michigan address and she represented to the process server that Maini lived at the house in Michigan on the date of service. (*Id.*). Maini does not dispute these facts and courts have held that these outward indica are sufficient to establish an abode. *See, e.g.*, *Jianjun Chen v. WMK 89th St. LLC*, No. 1:16-CV-5735-GHW, 2020 WL 2571010, at *8 (S.D.N.Y. May 20, 2020) ("Listing the address as one's residence on one's driver[']s license or otherwise representing the address as one's own can . . . qualify as sufficient indicia of permanence"); *PopSockets, LLC v. Hueffner*, No. 17-CV-827-PP, 2018 WL 4568823, at *11 (E.D.Wis. Sept. 24, 2018) (finding defendant's arguments that he did not live at a Sydney Drive address failed where his parents lived there, he stayed there when he returned to Wisconsin, he received mail there, the address was listed on his driver's license, and he gave the Federal courts Sydney Drive as his contact address); *Doyle v. Barnett*, 658 N.E.2d 107, 109 (Ind.Ct.App. 1995) (finding defendant's father's address was his "usual place of abode" for purposes of service because he received mail there, listed it on his driver's license, listed it on an accident report, and maintained the address

on his insurance). Moreover, Maini has not cited any authority for the proposition that notifying Proactifi that he has a residential address in New York required service to that address—and only that address—under Rule 4(e)(2); particularly given that the record reflects that he has a second "usual place of abode." The Court therefore finds that service to the address in Troy, Michigan was sufficient for purposes of Rule 4(e).[4]

The Court thus turns to Maini's second argument, that by leaving the copy of the summons and the complaint with someone other than Maini himself, Proactifi "fail[ed] Rule 4(e)." (*Id.* at 2). This argument is unpersuasive because it is contrary to Rule 4(e)(2), which explicitly provides that service can be effectuated by leaving the papers "with a resident of suitable age and discretion." Fed.R.Civ.P. 4(e)(2). Maini, understandably, does not argue that his mother was not a resident of suitable age and discretion. As such, this argument fails.

In sum: the Court finds that service on Maini was properly effectuated pursuant to Rule 4(e) when a copy of the summons and complaint was left with Maini's mother at Maini's usual place of abode in Troy, Michigan.

### B. The Court Has Subject Matter Jurisdiction Because Proactifi Has Plausibly Alleged its Federal Claims

Next, Maini argues that Proactifi has not adequately alleged either of its federal claims, and that once the federal claims fall, the Court lacks jurisdiction over the remaining state court claims. For the reasons set forth below, Maini is incorrect.

---

[4] In his reply, Maini argues that "Plaintiff has not met its burden to establish that service was properly effectuated, including because it provided no evidence that Michigan was Mr. Maini's dwelling on the date of service." (Dckt. #21 at 14). Rule 4(e)(2) explains that a copy of the summons and complaint can be left at the defendant's dwelling *or* usual place of abode. Maini's argument ignores the latter, which, for the reasons set forth above, is where Proactifi served him. *Llano Financing Grp. v. Lendzion*, No. 15 C 7091, 2016 WL 930660, at *2 (N.D.Ill. 2016) (explaining that meeting one of Rule 4(e)(2)'s options suffices).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility requires a plaintiff to "go beyond mere speculation or conjecture." *Wertymer v. Walmart, Inc.*, 142 F.4th 491, 495 (7th Cir. 2025). The complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A complaint that satisfies this standard is 'well-pled' and may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable." *Berk v. Choy*, 146 S.Ct. 546, 553 (2026) (cleaned up); *Orr v. Shicker*, 147 F.4th 734, 740 (7th Cir. 2025) (recognizing that the "notice-pleading standard is deliberately undemanding.") (cleaned up). As such, the Federal Rules require "no more than a statement of the claim" without the pleading of evidence to support it, *Berk*, 146 S. Ct. at 553.

When considering a motion to dismiss under Rule 12(b)(6), the Court "constru[es] the complaint in the light most favorable to the plaintiffs and accept[s] all well-pleaded factual allegations as true." *Horist v. Sudler & Co.*, 941 F.3d 274, 278 (7th Cir. 2019); *Esco v. City of Chicago*, 107 F.4th 673, 678 (7th Cir. 2024). Dismissal is only warranted if "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Christensen v. Cnty. of Boone*, 483 F.3d 454, 458 (7th Cir. 2007).

### 1. Proactifi Has Plausibly Alleged its CFAA Claim

The CFAA "subjects to criminal liability anyone who 'intentionally accesses a computer without authorization or exceeds authorized access,' and thereby obtains computer information." *Van Buren v. United States*, 593 U.S. 374, 379 (2021), *quoting* 18 U.S.C. §1030(a)(2)). Although initially conceived as a criminal statute, the CFAA now also "provides for a private right of

action for anyone that has suffered damage or loss of at least $5,000" due to a violation. *ExactLogix, Inc. v. JobProgress, LLC*, 508 F.Supp.3d 254, 262 (N.D.Ill 2020). A "plaintiff alleging violations of sections 1030(a)(2) or (a)(4) need only allege damage or loss, not both." *Motorola v. Lemko Corp.,* 609 F.Supp.2d 760, 767 (N.D.Ill. 2009). Maini argues that Proactifi CFAA claim is deficient because it has not plead any "damage" to its computer systems or qualifying "loss" worth at least $5,000 in the aggregate. The Court addresses each argument.

**a. Proactifi Has Plausibly Alleged "Damage" Under the CFAA**

Maini argues that Proactifi has not plausibly alleged "damage" as defined by the CFAA. Under the CFAA, "damage" means "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. §1030(e)(8). Maini asserts that Proactifi's complaint alleges that he "tamper[ed] with audit logs" and deleted traces of his activity, but stops short of alleging that his acts impaired the integrity or availability of Proactifi's data or systems, as required for Proactifi's claim to survive a motion to dismiss. (Dckt. #13 at 7). While Maini is correct that a plaintiff must allege impairment to the integrity or availability of its data to sufficiently allege "damage" as it is defined by the CFAA, *see Garelli Wong & Assocs., Inc. v. Nichols*, 551 F.Supp.2d 704, 709 (N.D.Ill. 2008), he is mistaken that Proactifi's complaint falls short in this respect.

In particular, Proactifi alleges that Maini: (1) impaired the availability of Proactifi's information, including that Maini "blocked" Pekin's access to Heroku, which Proactifi needed to conduct business, and "removed all preexisting documents and files owned by Proactifi, as well as Proactifi's product, including its proprietary code"; (b) engaged in the same "blockage and interference with a number of [Proactifi's other] key providers," including "Proactifi's Google Cloud service and GitHub"; and (c) "imped[ed] Proactifi's access to various applications,"

causing the loss of a key prospective customer and $100,000 deal. (Dckt. #1 ¶¶111–12, 142–44, 151, 212).

Maini does not address these allegations, and the Court finds they are otherwise sufficient to plausibly allege "damage" under the CFAA. *Patrick Patterson Custom Homes, Inc. v. Bach*, 586 F.Supp.2d 1026, 1035 (N.D.Ill. 2008) (finding plaintiff sufficiently alleged damage based on the "the permanent deletion and shredding of substantial files"); *Simmonds Equip., LLC v. GGR Intern., Inc.*, 126 F.Supp.3d 855, 865 (S.D.Tex. 2015) (finding allegations that defendant "suspended and temporarily deactivated Simmonds' company website causing an interruption in the website's service that rendered Simmonds' CEO unable to make a sales presentation in Colombia, which, in turn, caused Simmonds to lose a business opportunity valued at more than $1,000,000.00" sufficient to allege damage under the CFAA); *cf. Garelli Wong*, 551 F.Supp.2d at 709 (concluding allegations that the defendant engaged in only unauthorized copying and emailing plaintiff's computer files were insufficient to allege damage under the CFAA).

**b. Proactifi Has Plausibly Alleged "Loss" Under the CFAA**

Maini also argues that Proactifi has not sufficiently alleged "loss" under the CFAA. The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, . . . any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. §1030(e)(11). According to Maini, Proactifi has not plausibly alleged "loss" under the CFAA because, in his view, the definition is narrow and "loss" must be "directly tied to responding to or remediating actual technical harm to a computer system," (Dckt. #21 at 7), i.e., loss based on executive time, litigation-related costs, or generalized business disruption is insufficient. Proactifi, for its part, argues that weeks of its CEO's time, damage assessment and investigation of Maini's hacking,

forensic consultants, and attorneys' fees, all constitute loss for purposes of the CFAA and exceed $5,000. Proactifi has the better part of this argument.

In *Pascal Pour Elle, Ltd. v. Jin*, 75 F.Supp.3d 782 (N.D.Ill. 2014), the plaintiff alleged "that it incurred a loss of over $5000 in investigation and security assessment costs associated with [the defendant's] intrusion." *Id.* at 791. The Court found these allegations were sufficient to allege loss under the CFAA, and stated:

> Ultimately, the Court is more persuaded by the plain language of the statute which defines loss as "*any reasonable cost* to any victim, *including the cost of responding to an offense*." § 1030(e)(11). (emphasis added). The statute clearly states that loss includes any reasonable cost to the victim, and then provides examples of costs that could be considered reasonable under the statute. However, the definition, by its use of the word "including," does not state that the list is exhaustive. In addition, the Court finds that the "cost of responding to an offense" includes the costs associated with conducting investigation and security assessments in response to a suspected violation of the CFAA.

*Pascal*, 75 F.Supp.3d at 791 (emphasis in original). As another court more recently explained, "[t]he CFAA's definition of 'loss' is quite broad," and includes "'*any reasonable cost* to any victim, *including the cost of responding to an offense*.'" *Pl., Inc. v. Slesinski*, No. 23-CV-03878, 2025 WL 1677497, at *9 (N.D.Ill. June 13, 2025), *quoting* 18 U.S.C. §1030(e)(11).

This Court finds the reasoning of *Pascal* and *Pl. Inc.* persuasive. Again, here, Proactifi alleges it "suffered a monetary loss of at least $5,000, including . . . costs and expenses to conduct damage assessments and investigate the extent of Mr. Maini's hacking and unauthorized computer access . . ." (Dckt. #1 ¶151). These allegations are sufficient to survive a motion to dismiss. *Pl., Inc.*, 2025 WL 1677497 at *9 (collecting cases where allegations of loss related to a forensic investigation into defendant's conduct were sufficient under the CFAA); *Motorola, Inc.*

*v. Lemko Corp.*, 609 F.Supp.2d 760, 768 (N.D.Ill. 2009) (same).[5] Maini's motion to dismiss Proactifi's CFAA claim is therefore denied.[6]

**2. Proactifi Has Plausibly Alleged its DTSA Claim**

Under the DTSA, a trade secret includes:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information . . . if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information . . . .

18 U.S.C. §1839(3)(B).

To state a claim for violation of the DTSA, a plaintiff must "allege facts sufficient to provide notice that the relevant information constitutes a trade secret," and "that the defendant has misappropriated the trade secret within the meaning of § 1836(b)(1)." *Packaging Corp. of Am., Inc. v. Croner*, 419 F.Supp.3d 1059, 1065–66 (N.D.Ill. 2020); *In re Dealer Mgt. Sys.*

---

[5] Maini points to several cases which he argues support the position that business disruptions or forensic review do not constitute loss. *See* Dckt. #13 at 8 (citing *In re Dealer Mgt. Sys. Antitrust Litig.*, 362 F.Supp.3d 477, 501–02 (N.D.Ill. 2019); *CustomGuide v. CareerBuilder, LLC*, 813 F.Supp.2d 990, 996 (N.D.Ill. 2011); *Cassetica Software, Inc. v. Computer Scis. Corp.*, No. 09 C 0003, 2009 WL 1703015, at *4 (N.D.Ill. June 18, 2009); and *Quantlab Techs. Ltd. v. Godlevsky*, 719 F.Supp.2d 766, 776 (S.D.Tex. 2010)). The Court does not find these decisions to be persuasive because they either do not involve CFAA claims, are non-binding out-of-circuit cases, or go against the majority of more recent cases in this District which have held that business disruption and forensic review costs can constitute loss for purposes of the CFAA.

[6] In his reply, Maini argues for the first time that Proactifi also fails to allege that he exceeded his authorization by accessing its data. (Dckt. #21 at 6). This argument is waived. *See Int'l Ass'n of Fire Fighters, Loc. 365 v. City of East Chicago*, 56 F.4th 437, 452 (7th Cir. 2022) ("The appellants fail to address this point in their opening brief. And although they discuss the issue in their reply brief, by that point, their arguments are waived."); *Williams v. Bd. of Educ.*, 982 F.3d 495, 507 n.30 (7th Cir. 2020) ("[A]rguments raised for the first time in a reply brief are waived.").

*Antitrust Litig.*, 362 F.Supp.3d at 573 ("For a DTSA claim to survive a motion to dismiss, a complaint need only identify the alleged trade secret in a general sense.") (cleaned up). "At the pleading stage, plaintiffs need only describe the information and efforts to maintain the confidentiality of the information in general terms." *In re Dealer Mgt. Sys. Antitrust Litig.*, 362 F.Supp.3d at 573 (cleaned up). Maini argues that Proactifi's DTSA claim must be dismissed because it describes the trade secrets in a conclusory manner and it otherwise fails to allege any measures taken to safeguard its trade secrets. The Court disagrees.

**a. Proactifi Has Sufficiently Identified the Trade Secrets at Issue**

Maini first argues that Proactifi has not adequately identified its trade secret because the complaint "merely parrots the statutory elements" of a DTSA claim without providing "well-pleaded facts." (Dckt. #13 at 9). This argument ignores the allegations of the complaint.

In particular, the complaint alleges that Maini misappropriated "proprietary and highly confidential files of Proactifi," including a file titled "V1Functional – Nonfunctional Polish." (Dckt. #1 ¶¶ 96–106). As detailed in the complaint, this file "contains all the requirements for RealTalk (a proprietary Proactifi product), including highly sensitive and important data, competitive information, customer data, computer code, and other intellectual property owned by Proactifi (including its federally protected trademark and logo)." (*Id.* ¶105). Maini does not address these allegations, and at this stage, they are sufficient to establish legally cognizable trade secrets. *See e.g.*, *Wells Lamont Indus. Grp. LLC v. Richard Mendoza & Radians, Inc.*, No. 17 C 1136, 2017 WL 3235682, at *3 (N.D.Ill. July 31, 2017) (finding allegations that defendant took "substantial amounts" of confidential information such as "customer account information, product summaries, pricing sheets, product prototypes, product designs, and detailed sales reports" sufficient to survive motion to dismiss); *In re Dealer Mgmt. Sys.*, 362 F.Supp.3d at 573–

74 (finding allegations that the "DMS contains numerous proprietary CDK trade secrets, including forms, accounting rules, tax tables, and proprietary tools and data compilations" sufficient to survive a motion to dismiss).

**b. Proactifi Has Plausibly Alleged That It Took Measures to Safeguard its Trade Secrets**

Next, Maini argues that Proactifi fails to allege any actual measures taken to safeguard its purported trade secrets—"such as use of confidentiality agreements, technical access restrictions, or other security protocols." (Dckt. #13 at 9). Maini is mistaken for two reasons.

First, Proactifi attached the Consulting Agreement, Stockholder Agreement, and Confidentiality Agreement to its complaint. (Dckt. ##1–5). As other circuits have explained, confidentiality agreements and non-disclosures are generally indicia that a company has taken reasonable steps to safeguard its trade secrets. *See, e.g., Turret Labs USA, Inc. v. CargoSprint, LLC*, No. 21-952, 2022 WL 701161, at *2 (2d Cir. Mar. 9, 2022) (explaining that the "reasonableness analysis will often focus . . . on the importance of confidentiality and nondisclosure agreements to maintaining secrecy"); *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 660 (9th Cir. 2020) (holding that "[c]onfidentiality provisions constitute reasonable steps to maintain secrecy" under DTSA); *cf. Farmers Edge Inc. v. Farmobile*, LLC, 970 F.3d 1027, 1033 (8th Cir. 2020) (explaining a company, "without a confidentiality agreement and without other policies or practices for safeguarding secrets" does not take reasonable steps to safeguard its trade secrets under DTSA). Not only does Proactifi use confidentiality agreements, each agreement raised here refers to Proactifi's confidential information, and Maini acknowledged—through these agreements—that Proactifi's "Confidential Information was/is developed at great expense," (*see, e.g.*, Dckt. ##1-1 at 2; 1-2 at 5), and he agreed to "safeguard the Confidential Information from unauthorized use, access, or disclosure using at least the

degree of care it uses to protect its most sensitive information and no less than a reasonable degree of care." (*Id.*).

Even looking beyond the agreements, the complaint itself contains allegations regarding Proactifi's efforts to safeguard its trade secrets. For example, Proactifi alleges that Maini "used ProxyBypassList to circumvent secure routes and monitoring systems, effectively evading corporate firewalls, VPN restrictions, and security policies," (Dckt. #1 ¶ 132), and that Proactifi "terminated [Maini's] access credentials," (*id.* ¶ 149). These allegations likewise demonstrate that Proactifi has taken measures taken to safeguard its purported trade secrets.

**c. Proactifi Has Plausibly Alleged That Its Trade Secrets Have Independent Economic Value**

Maini further argues that Proactifi "is a pre-revenue startup with no commercialized product, raising substantial questions about whether its ideas or code possess independent economic value at all." (Dckt. #13 at 10). The Court cannot adopt this proposition because to do so would require it to construe the complaint's allegations in the light least favorable to Proactifi and this is the opposite of how the Court must analyze the complaint on a motion to dismiss. Moreover, the Court finds persuasive decisions that that economic value is properly alleged where, as here, the complaint contains allegations that the plaintiff took efforts to maintain secrecy of its information, including by having defendant sign an agreement with a confidentiality provision. *See, e.g.*, *PetroChoice LLC v. Amherdt*, No. 22-CV-02347, 2023 WL 2139207, at *4 (N.D.Ill. Feb. 21, 2023); *Nextpulse, LLC v. Life Fitness, LLC*, No. 22 CV 03239, 2024 WL 1376213 (N.D.Ill. Mar. 31, 2024) (finding allegations that the relevant contracts included confidentiality provisions to safeguard against disclosure of the trade secrets was sufficient to allege the economic value requirement of DTSA); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F.Supp.3d at 574 (finding allegations that plaintiff made efforts to prevent disclosure

of protected materials supported a finding of economic value). Proactifi has therefore provided sufficient allegations to meet DTSA's economic value requirement.

**d. Proactifi Has Plausibly Alleged That Maini Misappropriated Its Trade Secrets**

A plaintiff may show misappropriation under the DTSA by showing that the defendant: (1) acquired a trade secret knowing or with reason to know that it was acquired by improper means; or (2) disclosed or used the trade secret without express or implied consent. 18 U.S.C. §1839(5)(A)–(B). Maini argues that Proactifi did not sufficiently plead misappropriation because its description of the GitHub event "does not identify what was posted, whether it was in fact secret, or to whom it was disclosed." (Dckt. #13 at 10). However, the complaint, once more, is not as "generalized" or "sweeping" as Maini contends.

In particular, Proactifi alleges in detail that Maini: (a) "publicly disclosed Proactifi's private repositories on GitHub that contained Proactifi's confidential deployment scripts and backend code, including proprietary information relating to" its new AI product; and (b) publicly revealed Proactifi's trademark on GitHub and "effectively [stole] and falsely mark[ed] the origin of Proactifi's code and intellectual property" under his own name. (Dckt. #1 ¶¶115, 117.) These allegations go far beyond merely alleging that Maini only accessed Proactifi's information—as Maini argues (Dckt. #31 at 3)—and instead are sufficient to plead that Maini "disclosed or used the trade secret[s] without express or implied consent." *Sonrai Sys., LLC v. Waste Connections, Inc.*, 658 F.Supp.3d 604, 616 (N.D.Ill. 2023).

In sum: the Court finds that plaintiff has plausibly alleged its federal statutory claims under the CFAA and DTSA. Accordingly, this Court has subject matter jurisdiction over this case, and Maini's motion to dismiss pursuant to Rule 12(b)(1) and (6) is denied.[7]

**C. The Colorado River Abstention Doctrine Does Not Apply**

Next, Maini argues that even if this Court has jurisdiction, it should abstain from exercising it pursuant to the *Colorado River* abstention doctrine, which "permits federal courts to defer to a 'concurrent state proceeding' as a matter of 'wise judicial administration.'" *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 497 (7th Cir. 2011), *quoting Colorado River Water Conservation District v. United States*, 424 U.S. 800, 818 (1976). The doctrine creates a narrow exception to the general rule that "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court." *Colorado River*, 424 U.S. at 817. "Determining whether *Colorado River* abstention should apply requires a district court to make a two-part inquiry. 'First, the court must determine whether the concurrent state and federal actions are actually parallel.' If so, the court must consider second whether 'exceptional circumstances' justify abstention." *Adkins*, 644 F.3d at 498, *quoting Tyrer v. City of South Beloit*, 456 F.3d 744, 751 (7th Cir. 2006). Cases will be considered parallel for purposes of the doctrine where "substantially the same parties are contemporaneously litigating substantially the same issues in another forum." *Tyrer*, 456 F.3d at 752 (cleaned up). Thus, the operative question is whether there is a "substantial likelihood that the state litigation will dispose of all claims presented in the federal case." *Braid v. Stilley*, 142 F.4th 956, 969 (7th Cir. 2025), *quoting Clark v. Lacy*, 376 F.3d 682, 686 (7th Cir. 2004) (cleaned up).

[7] As Proactifi notes, the Court also has diversity jurisdiction over Proactifi's claims under 28 U.S.C. §1332. Maini disagrees. Because the Court finds that it otherwise has federal-question jurisdiction, it need not reach the parties' arguments under §1332.

### 1. The Present Matter and the State Court Action are Not Parallel

Maini argues that the present matter and the State Court Action are parallel because they involve essentially the same parties and "both suits arise from the same dispute." (Dckt. #13 at 12). But the question before the Court is "not whether the suits are formally symmetrical." *AAR Intern., Inc. v. Nimelias Enterprises S.A.*, 250 F.3d 510, 518 (7th Cir. 2001). Instead, the Court must determine "whether there is a 'substantial likelihood' that the foreign litigation 'will dispose of all claims presented in the federal case.'" *Id.*, *quoting Day v. Union Mines Inc.*, 862 F.2d 652, 656 (7th Cir. 1988).

On the facts presented, it does not seem substantially likely that the State Court Action will dispose of the claims presented in the instant federal suit. For one, the cases would require examination of different evidence. *Huon v. Johnson & Bell, Ltd.*, 657 F.3d 641, 647 (7th Cir. 2011) ("One important factor is whether both cases would be resolved by examining largely the same evidence.") (cleaned up). Once more, Maini's claims in the State Court Action are related to his alleged rights to Proactifi shares that were forfeited as a result of the Board Determination on May 4, 2025. In particular, Maini alleges that Proactifi breached the Grant Agreement by refusing "to honor his ownership of the 2,971 shares," "retaliated against him" for questioning improper financial activities, and owes him money for consulting services. *Maini v. Proactifi,* et al., Amended Complaint ¶¶3, 169, 218–20. Maini's claims that he has a right to shares in Proactifi, that Pekin breached certain fiduciary duties, and that he is owed money are largely based in contract and on his conduct *prior* to the Board Determination.

By contrast, Proactifi's claims in this case concern its allegations that Maini (its former employee) accessed its computer systems without authorization, breached numerous contracts, converted Proactifi's property, tortiously interfered with Proactifi's business relationships, and

misappropriated the company's trade secrets after his employment ended. Moreover, Proactifi's claims focus on Maini's allegedly unauthorized access to Proactifi's systems and misuse of confidential information *after* Maini separated from the company and the Board Determination, and, at a minimum, require discovery into Proactifi's forensic investigation and Maini's alleged access and disclosure of Proactifi's confidential information. This evidence is not implicated to the same extent, if at all, by Maini's claims. *See Huon*, 657 F.3d at 647 (explaining the case was "not a proper candidate for abstention" where the claims in each called for differing evidence); *Kafka v. Grady*, No. 12 C 50123, 2012 WL 6061095, at *3 (N.D.Ill. Dec. 6, 2012) (denying motion for stay based on the *Colorado River* doctrine, where, despite some overlap, the "two cases w[ould] not be resolved by examining largely the same evidence."); *USWAY Corp. v. Wardzala*, No. 11 C 7023, 2012 WL 138605, at *2 (N.D.Ill. Jan. 18, 2012) (same).

Because "[i]t would be a serious abuse of discretion" to abstain under *Colorado River* if "there is any substantial doubt" "that the parallel litigation will be an adequate vehicle for the complete . . . resolution of the issues between the parties," and because there does not appear to be a "'substantial likelihood' that the [State Court Action] 'will dispose of all claims presented in the federal case,'" *AAR Intern., Inc.*, 250 F.3d at 518, the Court finds that this case and the State Court Action are not parallel. Accordingly, the Court need not further analyze whether exceptional circumstances justify abstention, and it finds, in its discretion, that the *Colorado River* doctrine does not apply.[8]

[8] In reaching this conclusion, the Court has considered the supplemental authority filed by Maini, which consists of a ruling from the State Court Action allowing certain of his claims in his amended complaint to proceed. (Dckt. #40). That decision does not change the Court's conclusion that the two actions are not parallel.

## CONCLUSION

For the reasons set forth above, the Court denies defendant's motion to dismiss, (Dckt. #12). Defendant shall answer plaintiff's complaint by September 9, 2026.

**DATE: August 19, 2026**

**Jeffrey I. Cummings**
**United States District Court Judge**